(C.D. 2316)

Hi Test Twist Drill Works, Inc. v. United States

United States Customs Court, Second Division

(Decided February 15, 1962)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*William H. Orrick, Jr.*, Assistant Attorney General (*Henry J. O'Neill* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Lawrence, Judge: An importation of merchandise described in the record as masonry drills or drill bits (those terms being used interchangeably) was classified by the collector of customs as "Alloyed cutting tools" in paragraph 352 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 352), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and duty was imposed thereon at the rate of 30 per centum ad valorem.

Plaintiff's protest embodies various claims for lower rates of duty, but plaintiff relies mainly upon the claim that the merchandise consists of metal parts of articles having as an essential feature an electrical element or device, which are made dutiable at 13¾ per centum ad valorem as provided in paragraph 353 of said act (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739.

It is claimed alternatively that the articles should be classified as drills and dutiable at the rate of 22½ per centum ad valorem as provided in paragraph 396 of said act (19 U.S.C. § 1001, par. 396), as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462; or as articles in chief value of metal and dutiable at 21 per centum ad valorem as provided in paragraph 397 of said act (19 U.S.C. § 1001, par. 397), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108.

The pertinent statutes are here set forth:

Paragraph 352 of the Tariff Act of 1930:

PAR. 352. Twist and other drills, reamers, milling cutters, taps, dies, die heads, and metal-cutting tools of all descriptions, and cutting edges or parts for use in such tools, composed of steel or substitutes for steel, all the foregoing, if suitable for use in cutting metal, not specially provided for, 50 per centum ad valorem; cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chomium, 60 per centum ad valorem. The foregoing rates shall apply whether or not the articles are imported separately or as parts of or attached to machines, but shall not apply to holding or operating devices.

Paragraph 352 of said act, as modified by the General Agreement on Tariffs and Trade, *supra*, so far as pertinent:

Cutting tools of any kind containing more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium_____ 30% ad val.

Paragraph 353 of said act, as modified by said Torquay protocol, *supra*, so far as pertinent:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:
    Batteries
        *       *       *       *       *       *       *
    Other * * *_____ 13¾% ad val.

Paragraph 396 of said act, as modified by the Annecy protocol, *supra*:

Drills (including breast drills), bits, gimlets, gimlet-bits, countersinks, planes, chisels, gouges, and other cutting tools; all the foregoing, if hand tools not provided for in paragraph 352, Tariff Act of 1930, and parts thereof, wholly or in chief value of metal, not specially provided for_____ 22½% ad val.

Paragraph 397 of said act, as modified by the sixth protocol, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

    \*        \*        \*        \*        \*        \*        \*

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

    \*        \*        \*        \*        \*        \*        \*

Not wholly or in chief value of tin or tin plate:
Carriages, \* \* \*
Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum \* \* \*_____21% ad val.

At the trial, plaintiff limited its protest to the merchandise covered by entry 816860, which is represented by exhibits 1 and 2. As to all other entries, the protest was abandoned.

It is admitted by plaintiff that the drill bits contained vanadium, tungsten, molybdenum, or chromium above the quantities specified in paragraph 352.

In addition to exhibits 1 and 2, the following were introduced by plaintiff:

Exhibit 3—drill apparatus in which drill bits are used.

Exhibit 3A—brick drill bit removed from exhibit 3.

Exhibit 4—brick for purpose of illustrating use of exhibit 3.

Exhibit 5—drill bit for boring wood or light gauge metal.

Defendant introduced exhibit A, stated to be identical with exhibit 2, but differing in size.

Plaintiff, in its brief, sets up the issue as follows:

The issue depends primarily upon whether or not the articles under protest are "cutting tools". The collector found that they were "cutting tools". Plaintiff claims that they are drills for making holes in masonry, and since masonry must be pulverized, and can not be cut, the imported bits, which actually pulverize masonry in order to make a hole, are not "cutting tools".

The only witness, Max Amper, was called by plaintiff. He testified in substance as follows:

For the past 10 or 11 years, as president of the plaintiff company, he had been engaged in purchasing, and management of sales, in a general executive capacity. The business of his company is the importing of drills of all types from Europe for sale throughout the United States. He identified exhibit 1 as a Premier carbide-tipped drill, which represents the different sizes of drills on the invoice covered by entry 816860. Exhibit 2 was stated to represent the item on the invoice described as a Hi Test carbide-tipped drill. While

the invoice covered drill bits in different sizes, the witness stated that the "general make-up * * * is the same, * * * The size of the drill is determined by the size hole that it will grind, not by the length." The drills are primarily designed for boring holes in brick or concrete.

Through his sales organization, which covered about 80 per centum of the United States where these drills are sold and used, and from his personal observation, he described the use of the drill by means of a drill apparatus, represented by illustrative exhibit 3, and a brick, illustrative exhibit 4, as follows:

* * * I'm going to turn the current on to revolve Exhibit No. 3. I'm now applying pressure of the drills against the brick, creating an abrasive grinding action on the brick, causing a pulverization of the brick on that part of the brick directly below the surface of the drill bit.

The pulverized matter, in this operation, corresponds to the sawdust or shavings produced in sawing or boring holes in wood. The drills are powered by electric motors only. It appears from the record that the speed in which these drills operate is from 2,200 to 2,400 r.p.m.

The argument of plaintiff that these drills are not cutting tools seems to rest largely upon the contention that because the drills when in operation produce a pulverized matter, rather than shavings or sawdust, the operation must be one of grinding rather than of cutting. However, we are not impressed by this contention. The fact that the drills in boring holes produce a powder instead of shavings is, of course, due to the nature of the material in which a hole is being bored, and although the drills do not have sharp cutting edges, nevertheless, the drills are so shaped that when revolving at a high speed, as indicated above, they naturally perform a cutting operation.

Plaintiff cites, in its brief, several definitions of the word "cutting," which connote something that cuts or is adapted to cut or as being edged or sharp. It is a matter of common observation that there is a wide difference in the sharpness or edge of cutting instruments, as, for instance, the keen edge of a razor, as compared to the blunt edge of a butter knife. Each of these articles is used for the purpose of cutting in their respective areas of operation. So, too, drills vary in the degree of cutting quality, depending upon whether they are to be used to cut gems, metal, wood, or masonry.

In arriving at the intent of Congress from the language of paragraph 352 of the basic act, it is noted that after enumerating "Twist and other drills," *inter alia*, the phrase appears "all the foregoing, if suitable for use in cutting metal," which makes it obvious that Congress regarded drills as cutting tools.

The paragraph then provides for "cutting tools of any kind" containing certain alloys, which is the classification adopted by the collector in this case. If, therefore, "Twist and other drills" were re-

garded by the Congress as "metal cutting tools," it would seem logical that Congress intended that the provision for "cutting tools of any kind" containing certain alloys would embrace drills of the kind involved in this case, the purpose of which is to cut brick or concrete.

Having in mind the purpose for which the subject drills were designed, we are of the opinion that even though the imported drills do not have sharp edges, they do, nevertheless, when in operation, turning at speeds at 2,200 to 2,400 r.p.m., cut through the brick or other form of masonry in which they are employed.

The word "drill" is defined in Webster's New International Dictionary of the English Language, second edition, 1953, as follows:

drill, *n.* 1. a An instrument with an edged *or pointed* end, used for making holes in hard substances; strictly, a tool that cuts with its end, by revolving, as in drilling metals, or by a succession of blows, as in drilling stone. * * * [Italics supplied.]

The foregoing definition is accompanied by illustrations of various types of drills, some of which appear to be similar to exhibits 1 and 2 herein.

Exhibits 1 and 2, which represent the various sizes of drills here under consideration, have pointed tips and are flanged and fluted to perform the purpose for which they were designed. Due to the structural character and composition of brick and concrete, drills with edges like those of exhibits 1 and 2 are, it is believed, much better adapted to cut or bore holes in brick or concrete than would be the case if the drills had sharp edges.

An interesting sidelight upon the issue herein is contained in a voluminous compilation, known as Machinery's Handbook, 16th edition, 1959, page 1518. Under the heading "Speeds for Turning Unusual Materials," appears the following:

* * * *Tools tipped with tungsten carbide are adapted for cutting various nonmetallic products which cannot be machined readily with steel tools, such as slate, marble, synthetic plastic materials, etc.* In drilling slate and marble, use flat drills; and for plastic materials, tungsten-carbide-tipped twist drills. * * * [Italics supplied.]

It is quite clear that the author of the quoted material was concerned with drills for cutting various nonmetallic products, such as marble, slate, and synthetic plastic materials.

For the foregoing reasons, we are of the opinion that the subject drills are "cutting tools of any kind" containing more than the specified percentages of the alloys described in paragraph 352, *supra,* and should be so classified, unless otherwise more specifically provided for.

Even though the drills in controversy may be, in fact, described in paragraph 353, relied upon by the plaintiff, the provision in paragraph 352, above quoted, being a use provision, is more specific

than the one relied upon in paragraph 353. *Cf. United States* v. *R. W. Cramer & Co., Inc.*, 22 C.C.P.A. (Customs) 45, T.D. 47049.

Plaintiff's claim for classification in paragraph 396, as modified, *supra*, is without substance. Said paragraph is applicable to drills and other cutting tools "if hand tools not provided for in paragraph 352 * * * and parts thereof." The drills under consideration are powered by electricity.

For obvious reasons, the claim of plaintiff for classification in the catchall metal paragraph—397—is without merit.

The following two cases, among others, cited by plaintiff, in its brief, *Biax Flexible Shaft Co.* v. *United States*, 61 Treas. Dec. 1600, Abstract 19872; *A. Klingelhofer Co.* v. *United States*, 63 Treas. Dec. 1496, Abstract 23959, are clearly distinguishable. Both of them involved the classification of certain files. In each case, the court followed the decision of this court in *H. Boker & Co. (Inc.)* v. *United States*, 60 Treas. Dec. 482, T.D. 45145, relating to the classification of hacksaw blades. In those cases, the competition was between a use provision and *eo nomine* provisions, which distinguishes them from the case at bar and renders them inapplicable to this controversy.

Plaintiff places some reliance upon *Kindt-Collins Co.* v. *United States*, 72 Treas. Dec. 903, Abstract 36942, which we regard as having little, if any, bearing upon this issue. The court there held that a heavy steel disk, 12 inches in diameter and one-quarter inch thick, having cutting grooves or corrugations on both sides similar to those on ordinary hand files and used for filing off the edge of metal, was properly classifiable as parts of machine tools, rather than as metal cutting tools. In its opinion, the court said, referring to the testimony of a witness:

* * * while the operation of the disk might be referred to as cutting, it would more properly be described as grinding metal; * * *.

The facts and the issues in that case are so different from those in the instant one that it is not persuasive.

Upon the record before us and for the reasons stated, we overrule the protest on all grounds, insofar as it relates to entry 816860. As to all other entries, the protest, having been abandoned, is dismissed.

Judgment will be entered accordingly.